No. 14-0587 – *State of West Virginia ex rel. Patrick Morrisey, Attorney General of West Virginia v. West Virginia Office of Disciplinary Counsel and West Virginia Lawyer Disciplinary Board*

**FILED**

November 14, 2014
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

Benjamin, Justice, concurring in part, dissenting in part, and concurring in the judgment:

ONCE upon a time, there was a village by the sea. Some villagers fished the sea in their trawlers. Others were content to cast their lines in a vast freshwater inland lake where fish were abundant. Yet other villagers were farmers, who worked the land and who used the lake to water their livestock. All the villagers were happy. Food was plentiful. No one went hungry. Villagers enjoyed recreational time at the beach, at the lake, and at the parks. Life was good for the village by the sea.

One day, the lead sea captain of the sea trawlers noticed that sea conditions had become such that he now had more fishermen than needed to meet his quotas for fish. At the same time, he noticed that the lake anglers were often unable to meet their quotas. The lead sea captain proposed that several of his fishermen be transferred to the lake, on an as-needed basis, to assist the lake anglers.

Upon learning of this, the farming boss immediately objected, maintaining that sea fishing was sea fishing and lake fishing was lake fishing. He asserted that it was

1

simply not proper for the chief lake angler to supervise sea fishermen who, though competent fishermen, had been trained their entire lives by others in the net-method of fishing, not the line-method of fishing. The farming boss warned that if the lead sea captain insisted on the transfer, the farmers would construct irrigation ditches to their fields from the lake, thereby reducing the lake's fish population to a level compatible with the quota abilities of the lake anglers.

A conflict having arisen in the village, the matter was taken before the village elders. Determined to get to the bottom of the controversy that was disturbing the village's customary calm, the Elders asked if any sea fishermen had yet been transferred to the lake. The lead sea captain and the chief lake angler assured that such was not the case. The Elders then inquired whether digging had commenced on the irrigation ditches. The farming boss responded that construction of irrigation ditches had not begun, being merely in the planning stages. The Elders exchanged glances among themselves, and then proclaimed—partly in exasperation and partly in relief—"There is no current conflict here! Everything is running along smoothly, just as it always has been."

The representatives of the various occupations heeded the Elders' proclamation, and, indeed, all the villagers in attendance were constrained to admit that the sea might thereafter grow less jealous of its bounty, such that no fishermen need ever be transferred and no irrigation ditches need ever be dug. Indeed, everything probably

2

had been premature. Just as the proceedings were about to adjourn, however, the Elders conferred among themselves and announced that a fence would be built all the way around the lake, with but two gates for which the farming boss and the chief lake angler would be given the only keys. At this, the lead sea captain leapt to his feet and exclaimed, "But this is unnecessary. Our fishermen will have no place to take their families on the weekends! Other villagers will no longer be able to enjoy the lake. With all respect, learned Elders, why would you insist upon such an unnecessary and extravagant thing when there is no current need?" A reverential hush fell as the question lingered in the room. "Because," the Elders replied nonchalantly, "we know what is best for all of you, we know what you need, we are quite good at building fences, and this is what is needed for life to be good in our village by the sea."

\* \* \* \*

I agree with the majority that the requested writ should be denied, and I concur in its opinion insofar as it concludes that the Attorney General is without standing to bring this proceeding. It is perhaps more accurate to say that the matter is not yet ripe for adjudication, but, in either case, it is plain that the threshold requirement of justiciability is lacking. Moreover, the majority is manifestly correct that a decision on the merits would constitute an impermissible advisory opinion, a determination that ought to end the analysis then and there. We possess no jurisdiction to proceed farther. *See*

3

*Clark v. Shores*, 201 W. Va. 636, 637 n.4, 499 S.E.2d 858, 859 n.4 (1997) ("'The courts of this State have no jurisdiction . . . if no justiciable controversy exists. . . . Courts are not constituted for the purpose of making advisory decrees or resolving academic disputes.'") (quoting *Town of So. Charleston v. Bd. of Educ. of Kanawha Cnty.*, 132 W. Va. 77, 83, 50 S.E.2d 880, 883 (1948)).

Notwithstanding the unassailable case it makes that it has no authority to render an advisory opinion, the majority proceeds to embark on that very journey. The trip is justified, according to the majority, because the scope of the Attorney General's authority is "collateral" to what it describes as the ultimate issue before us, *i.e.*, whether the exercise of such authority would violate the ethics rules. With all respect to my colleagues in the majority, the ultimate issue before us has been revealed as whether we have jurisdiction of the Attorney General's petition. Having answered that question in the negative, we are bound to answer no others.

The majority's designation of the scope-of-authority dispute as merely collateral is further belied by its characterization of the question as a "singular issue [having] immense importance to our criminal justice system." If the majority's assertion proves true, then its opinion will not long be remembered for the ethics context from which it arises or even for its cogent discussion of standing. The majority opinion will instead be recalled as a definitive curtailment of executive power by a coequal branch of

government. Declarations of that sort are—for good reason—not routinely made (the majority admits that its adjudication on the merits is an "extraordinary measure"), and the opportunity to make them ought not be sought out. A big, bushy tail may be perceived at the outset as collateral to the dog, but when the tail then wags the dog, the tail rightly assumes paramount importance in the eyes of all.

Finally, the lone authority cited by the majority in support of its remarkable trek, *see State ex rel. Foster v. Luff*, 164 W. Va. 413, 264 S.E.2d 477 (1980), is of no avail. In *Foster*, we accepted jurisdiction over a petition seeking review of a trial court's decision to curtail the resources available to an indigent criminal defendant who had requested the procurement of expert services. We took the opportunity thus afforded to explain how the court in that case (and, indeed, future courts) should evaluate such requests. Although we informed the parties and the bar that we would not, in the future, accept interlocutory trial rulings for review by extraordinary writ, *see* 164 W. Va. at 419, 264 S.E.2d at 481, the proceeding in *Foster* was the functional equivalent of one commenced pursuant to West Virginia Code § 58-5-2 to resolve a substantial question of law in facilitation of the underlying litigation.

Regardless of its precise source, our jurisdiction to consider the question presented in *Foster* was appropriate, and, upon the exercise of that jurisdiction, we certainly possessed the discretion to instruct the lower tribunal in sufficient detail that it

5

might more assuredly conduct the inevitable proceedings on remand. That is not the situation we confront here, where the dispute has not ripened and the Attorney General is without standing to pursue his petition. There is no jurisdiction to decide anything before us—other than that we have no jurisdiction—and there is no inevitable proceeding awaiting on remand that might benefit from our guidance. I must, therefore, respectfully dissent from that part of the majority's opinion in which it has elected to ignore the established norms governing the boundaries of judicial authority by discussing the merits of an issue (whether described as primary or collateral) that has been brought to our attention by other than legally prescribed means.